IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 1:21-cr-264-LMB |
| FARHAAD RIYAZ, | |
| Defendant. | |

## POSITION ON SENTENCING OF DR. FARHAAD RIYAZ

Dr. Farhaad Riyaz is a 34-year-old husband and father with no prior criminal history.  By way of profession, Dr. Riyaz is a board-certified Mohs (skin cancer) surgeon, who has diagnosed and treated thousands of cancer patients, devoting significant portions of his time to provide care to underserved communities.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████  For most of his adult life, including the entire time period during which the conduct which brought Dr. Riyaz before this Court occurred, this significant mental health condition was undiagnosed and untreated.  That is no longer the case, but Dr. Riyaz's conduct can only be understood and explained in the context of his untreated condition.  Quite simply, behavior that on its face appears irrational and incomprehensible comes into focus through the lens of that diagnosis.



      As discussed in greater detail below, Dr. Riyaz has fully accepted responsibility for his conduct and understands there are consequences for those actions.  He has accepted those consequences and has made significant efforts to make amends for his past conduct.  With continued treatment, there is little risk of re-offense and, under the circumstances, the advisory Sentencing Guidelines range significantly overstates that which is sufficient but not greater than necessary to accomplish the purposes enumerated in 18 U.S.C. § 3553(a).  A lengthy custodial sentence would serve only to risk interrupting the critical treatment Dr. Riyaz has received and continues to receive.  For the reasons discussed herein, it is respectfully submitted that the Court can and should in this case impose a variance from the advisory Guidelines range in the form of

a noncustodial probationary sentence, or a period of supervision incorporating alternatives to imprisonment such as intermittent and home confinement, that will appropriately and fully accomplish the objectives of §3553 while avoiding excessive or disparate punishment in this case.

**Offense Conduct and Sentencing Guidelines**

Several years ago, Dr. Riyaz began purchasing items through Amazon and retaining those items while also purchasing and then returning for refund substitute products of lower value.  At no point did Dr. Riyaz attempt to resell or profit from any of the items obtained in this fashion. Instead, the products were compulsively hoarded and left largely unused and untouched.  Indeed, when the government executed a search warrant on Dr. Riyaz's home in June 2020, most of the items were located new and in unopened boxes in his storage basement.  As described to the Court at the time of the guilty plea and in Attachment A to this memorandum, Dr. Riyaz perceived that he had been defrauded through various online purchases and became obsessed with the notion that Amazon was responsible for this.  To be clear, in no way is this fact suggested as a justification for Dr. Riyaz's conduct.  Rather, in the context of the information provided in Attachment A, it serves only as an explanation for the genesis of his actions.

In December 2021, Dr. Riyaz pleaded guilty to one count of mail fraud, in violation of 18 U.S.C. § 1341.  Shortly after the search of his residence in 2020, Dr. Riyaz sought help and began to demonstrate full acceptance of responsibility for his conduct.  Dr. Riyaz ultimately agreed to plead guilty prior to the filing of any criminal charges, and he agreed to cooperate fully with the government, as discussed further below.  Dr. Riyaz further consented to the forfeiture of the items seized from his residence as well as full restitution, in the amount of $312,964.38 for which Dr. Riyaz already has made payment.

The advisory Guidelines in this case are accurately reflected in the Presentence Report resulting in an adjusted offense level of 19 which, after credit for acceptance of responsibility, is reduced to a total offense level of 16.  Because Dr. Riyaz has no criminal history whatsoever, this results in an advisory Guidelines range of 21 to 27 months.  But that formulaic mathematical calculation does not take into account Dr. Riyaz's particular circumstances, and as the Court fully understands, "the Guidelines are only one of the factors to consider when imposing sentence, and §3553(a)(3) directs the judge to consider sentences other than imprisonment." *Gall v. United States*, 552 U.S. 38, 59 (2007).

In the present case, when all the relevant factors in §3553(a) are given appropriate consideration, a substantial variance from the Guidelines range is warranted.  Dr. Riyaz's mental health condition, as well as his ongoing and successful efforts to pursue treatment and rehabilitation, weigh heavily in favor of a variance to a noncustodial sentence.  As the Supreme Court emphasized in *Gall*, a "District Court quite reasonably attache[s] great weight to [a defendant's] self-motivated rehabilitation, [] undertaken not at the direction of, or under supervision by, any court, but on his own initiative.  This also lends strong support to the conclusion that imprisonment [is] not necessary to deter [the defendant] from engaging in future criminal conduct or to protect the public from his future criminal acts."  552 U.S. at 59.  Given Dr. Riyaz's condition and the effectiveness of his ongoing treatment, continued care as determined by his treating psychiatrist should be a mandated condition of any sentence rather than being disrupted by a period of imprisonment.

The Guidelines make clear that "[p]robation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing."  U.S.S.G., Guidelines Manual, Ch. 5, Part B,

Introductory Commentary (2021); *see* 18 U.S.C. § 3561.  Such is the case here.  While not directly applicable to the Guidelines calculation in this case, in a similar context, "a departure from the sentencing options [for Zone C to Zone B of the Sentencing Table, allowing for sentencing alternatives to a term of imprisonment] is appropriate to accomplish a specific treatment purpose."  U.S.S.G., Guidelines Manual, § 5C1.1, Commentary, Note 7 (2021).  Relevant to the present case, courts should consider such a departure upon finding that "the defendant . . . suffers from a significant mental illness," and the offense conduct "is related to the treatment problem to be addressed."  *Id.*  Both are true in the present case.

**Application of the § 3553(a) Factors**

To achieve "a sentence sufficient, but not greater than necessary," in this case, the Court should take into account all of the factors in §3553(a), several of which are addressed at greater length below.

**A.      Dr. Riyaz's Mental Health Condition and Treatment**





████████████████████████████████████████████

██████████████████████████████

**B.      Dr. Riyaz's Personal History and Characteristics**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual." *Koon v. United States*, 518 U.S. 81, 113 (1996).  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  Thus, in determining the appropriate sentence, Dr. Riyaz's personal "history and characteristics" may appropriately factor into the Court's evaluation.  18 U.S.C. § 3553(a)(1).  As the following sections will show, the totality of Dr. Riyaz's life and background illustrate the absence of any aggravating factors and the presence of several mitigating factors.

**1.      Early Life and Upbringing**

The son of Pakistani immigrants, Dr. Riyaz was born in Arlington, Virginia, as the youngest of three siblings.  After Dr. Riyaz's father lost his job due to anti-Muslim discrimination, his mother became the sole income earner in the family.  Dr. Riyaz attended a Virginia public high school as an honors student and scholar-athlete.  Dr. Riyaz was raised in a strict and demanding home, and behind Dr. Riyaz's academic and athletic success was a far more difficult and traumatic childhood, reflected in greater detail in the Presentence Report and not further recounted here in the interest of privacy.

**2.      College and Medical School**

Both Dr. Riyaz and his sister found refuge in leaving their home for college.  Dr. Riyaz earned a full scholarship to attend Virginia Commonwealth University ("VCU"), where he

earned his B.S. degree in biomedical engineering.  In light of his achievements at VCU, Dr. Riyaz was accepted into a prestigious honors program, resulting in early admission to the VCU School of Medicine, one of Virginia's top medical schools.  During his first year of medical school, Dr. Riyaz earned the top grade in the mandatory Physiology course (known to be particularly difficult) and the A.D. Williams Award (as the top student in his first-year medical school class).  For these achievements, Dr. Riyaz was inducted into VCU's Alpha Omega Alpha ("AOA") honors society and he would later become president of VCU's AOA chapter.  Dr. Riyaz ultimately graduated as one of the top 3 students in his medical school class.  Though Dr. Riyaz excelled academically during this time, he slept only four hours per night for much of his medical school tenure, which took a significant toll on his physical and mental well-being.

      **3.**      **Skin Cancer Surgeon and Community Medical Service**

Following medical school, Dr. Riyaz joined the St. Joseph Mercy Health System (in Ann Arbor, Michigan) as an intern, before serving as a dermatology resident at the Henry Ford Health System (in Detroit).  As his residency progressed, Dr. Riyaz was honored with the opportunity to serve as chief resident and chair of the Graduate Medical Education House Staff Council (representing the interests of over 900 Henry Ford medical residents).  Dr. Riyaz's medical training culminated in a prestigious fellowship in dermatologic surgery and oncology at Northwestern University Feinberg School of Medicine.

During the course of his medical career, Dr. Riyaz has conducted extensive biomedical research, culminating in lectures, presentations, book chapters, and scholarly articles offering novel insights and cutting-edge methods for treating serious skin conditions.  Moreover, as a resident representative for the American Academy of Dermatology, Dr. Riyaz organized physician trips to Capitol Hill to represent the interests of dermatologists and to advocate for

enhanced patient access to quality, low-cost treatment nationwide.  And notwithstanding his rigorous residency schedule, Dr. Riyaz also committed countless hours towards pro bono dermatological and other medical services for children and families in Detroit and Flint—including screening patients for lead toxicity during the Flint water crisis.  Dr. Riyaz's commitment to pro bono medical service also extended internationally; through an American Academy of Dermatology grant, Dr. Riyaz traveled to Botswana to provide dermatological care to underserved communities.

Following his residency, Dr. Riyaz passed the Micrographic Dermatologic Surgery certification exam administered by the American Board of Dermatology and became a board-certified Mohs (skin cancer) surgeon.  For his early career accomplishments and volunteer medical service, Dr. Riyaz was honored as a "Top Doctor" by *Washingtonian* Magazine and as a "Top Advocate" by the American Society for Dermatologic Surgery Association.

Dr. Riyaz continues to find deep fulfillment in volunteer medical service.  Starting in the early months of the COVID-19 pandemic, Dr. Riyaz has served on the Virginia Medical Reserve Corps for Fairfax, Prince William, and Washtenaw (MI) Counties, where he has administered COVID-19 tests, vaccination, and treatment to children and families in his local communities. And given the nationwide shortage of Mohs surgeons in the United States, Dr. Riyaz also regularly volunteers with the Arlington Free Clinic and has served as director of dermatology for the ADAMS Compassionate Healthcare Network.  In both roles, Dr. Riyaz provides no-cost skin cancer treatment for uninsured patients.  Beyond this, Dr. Riyaz volunteers with Physicians for Human Rights, where he conducts medical assessments, prepares medical reports, and delivers expert testimony for refugees seeking asylum in the United States.

**C.      Sentencing Objectives of §3553(a)(2) and (7)**

As noted above, Dr. Riyaz fully acknowledges the seriousness of his offense conduct and the fact that consequences are warranted for that conduct.  Indeed, Dr. Riyaz has accepted the significant consequences he has faced to date and has taken steps already to make amends for his conduct.

**1.      Payment of Restitution and Forfeiture**

"Restitution is included among the factors courts should consider in determining whether to reduce a sentence for the defendant's 'acceptance of responsibility.'" *United States v. Hairston*, 96 F.3d 102, 107 (4th Cir. 1996) (quoting USSG, Guidelines Manual, § 3E1.1, Application Note 1(c)).  In acceptance of his responsibility for the offense conduct and the resulting harm to the victim, Dr. Riyaz paid full restitution of $312,964.38 in advance of sentencing on March 3, 2022.[1]  Particularly given the adverse financial consequences of his conviction, discussed below, this payment had a significant impact on Dr. Riyaz.  Moreover, Dr. Riyaz forfeited any claims to the items seized from his property related to the offense conduct, and because he did so in addition to paying full restitution, the proceeds of that forfeiture will be retained by the government.[2]  In this case, full payment of restitution in advance of sentencing constitutes a mitigating factor underscoring Dr. Riyaz's acceptance of responsibility, the ongoing progress of his mental health treatment and therapy, as well as his rehabilitation as a law-abiding member of society.

---

[1] Dr. Riyaz was prepared to make payment of restitution well in advance of the resolution of this case, but the amount of restitution due was not established until shortly before a plea agreement was reached.

[2] Based on the substantial restitution and forfeiture imposed in this case, as well as the significant deterioration in Dr. Riyaz's financial condition as a result of his conviction, it is respectfully submitted that no further fine or other financial penalty is warranted in this case.

### 2.      Professional and Employment Consequences for Dr. Riyaz

Soon after his plea hearing in December 2021, and consistent with the requirements of this Court, Dr. Riyaz affirmatively disclosed his guilty plea to all state medical licensing authorities and to the medical practices where he worked.  While Dr. Riyaz has been universally regarded as a top cancer surgeon at all of these practices, given the uncertainty of sentencing and the prospective collateral effects on his medical licensure, Dr. Riyaz was placed on temporary leave or forced to resign from his medical practices.  For the time being, Dr. Riyaz has been relegated to treating cancer patients almost exclusively via telemedicine.  Per discussions with practice leadership, it is Dr. Riyaz's understanding that these practices would like him to return to full-time, in-person surgery for cancer patients.  Likewise, multiple state medical boards have initiated disciplinary proceedings, and at least three have suspended Dr. Riyaz's license pending resolution of the present case.  It is respectfully submitted that any significant period of imprisonment for Dr. Riyaz would be likely to result in irreparable consequences to his medical licenses, his future employment, and his ability to support his family financially.  Beyond the detrimental effect on his employment, Dr. Riyaz also has received substantial negative media attention and scorn in his tight-knit religious and dermatology communities and was obliged to resign as the elected president of the Virginia Dermatology Society.

### 3.      Substantial Effect on Dr. Riyaz's Family

Since Dr. Riyaz's marriage, he has been the primary source of financial support for his family.  Dr. Riyaz's wife is also a successful physician; however, over the years, Dr. Riyaz's income has paid for the overwhelming majority of the family's mortgage, food and other living expenses, as well as specialized instruction and therapy for his daughter's speech and developmental disabilities.  Dr. Riyaz's income has diminished precipitously as a result of his

conviction.  Following his plea and temporary suspension at several medical practices, Dr. Riyaz's wife now works more to account for the financial impacts of Dr. Riyaz's limited work opportunities.  In turn, Dr. Riyaz has taken on the lion's share of care for their daughter.  Dr. Riyaz's primary caregiving includes taking his daughter to frequent doctors' appointments, bringing her to her prescribed developmental and speech therapy sessions, engaging her throughout the day, and dedicating extra time to ensure a strong father-daughter relationship.  Dr. Riyaz's own treatment specifically recommended greater parental caregiving duties, and Dr. Riyaz's strengthened relationship with his daughter has been integral to the ongoing success of his therapy.  Given this, any sustained period of incarceration would inflict significant additional damage to Dr. Riyaz's mental health treatment, his family's financial well-being, and his daughter's diagnosed developmental needs and care.

**D.      Dr. Riyaz's Efforts to Cooperate and Provide Substantial Assistance**

As part of his plea agreement, Dr. Riyaz agreed to cooperate fully with the government. Following his acceptance of the government's plea offer, Dr. Riyaz met with the government at length to provide information that might be of assistance to the government in the investigation or prosecution of others.  The government has advised counsel that, having considered Dr. Riyaz's information, it will not file a motion pursuant to § 5K1.1 of the Guidelines.  Counsel does not take issue with the government's decision, which by agreement is committed to its sole discretion.  Counsel submits, however, that Dr. Riyaz's efforts, detailed further below, offer this Court a further demonstration of Dr. Riyaz's acceptance of responsibility and serve as an additional factor for this Court's consideration in fashioning an appropriate sentence that will achieve the objectives of §3553.

█████████████████████████████████████████



### E.    Avoiding Unwarranted Sentencing Disparities

Sentencing determinations should be informed by "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Counsel has sought to identify similar cases prosecuted by the Department of Justice.  At least based on public reports, there are none.  To be sure, prosecutions involving fraudulent activities directed at Amazon and other online retailers do exist, but again at least based on public reporting, the conduct in all of those cases appears to involve significant aggravating factors not present in Dr. Riyaz's case.  Specifically, counsel has

not identified another case brought at either the federal or state level where the prosecuted conduct did not also involve resale of the fraudulently obtained items for profit.  Further, counsel has not identified any prosecutions for similar offense conduct that involved similar issues of mental health or equivalent efforts at cooperation and substantial assistance.

In a review of federal prosecutions, counsel submits that the following case and sentence serve as the most readily comparable prosecution for purposes of considering what would constitute an unwarranted sentencing disparity.  In 2018, Joseph Sides was indicted in the Northern District of Florida on one count of conspiracy to commit wire fraud, eight counts of wire fraud, and four counts of mail fraud.  *United States v. Joseph Sides*, Case No. 4:18-cr-00057-MW-CAS (N.D. Fla., Sept. 18, 2018).  After initially pleading not guilty, Mr. Sides ultimately pleaded guilty to one count of conspiracy to commit mail fraud for using "501 Amazon accounts," to obtain "$229,391.42 in merchandise, replacements, and refunds by falsely claiming the merchandise had not been delivered or was damaged" and then reselling "the Amazon merchandise using online retail services, such as eBay, Craigslist, and Gameflip."  Boca Raton Man Charged with Wire and Mail Fraud, U.S. Dept. of Justice (Oct. 5, 2018), available at: <https://www.justice.gov/usao-ndfl/pr/boca-raton-man-charged-wire-and-mail-fraud>.  As part of the plea agreement, the remaining charges were dismissed by the government.  Mr. Sides was sentenced to five years of supervised probation, with terms including: "not testing positive for drugs, paying restitution in full, and completing 400 community service hours."  *Sides*, D.E. 64. In 2021, after completing "just over two of his five years of probation," the court found that Mr. Sides had satisfied all the terms of probation and terminated his probation, thereby closing his case.  *Id.*

18

In that case, unlike Dr. Riyaz's, the court records contain no indication that the defendant suffered from any mental health conditions that contributed to the offense conduct.  Indeed, Mr. Sides's probation conditions did not mandate any mental health treatment.  Further, in that case, unlike here, Mr. Sides possessed a profit motive, as he was engaged in reselling the goods on other online retail platforms.  *Sides*, *supra*, D.E. 42.  In short, the defendant's offense conduct, while apparently two levels lower in terms of total intended loss amount for purposes of the advisory Guidelines calculation, was arguably more egregious than Dr. Riyaz's and without comparable mitigating factors such as cooperation or mental health treatment.

Counsel did also identify a case involving a man who pleaded guilty late last year in the Western District of North Carolina to "executing a return scheme that defrauded Amazon of at least $290,000."  Charlotte Man Pleads Guilty To Wire Fraud For Return Scheme Targeting Amazon, U.S. Dept. of Justice (Oct. 5, 2021), available at:  <https://www.justice.gov/usao-wdnc/pr/charlotte-man-pleads-guilty-wire-fraud-return-scheme-targeting-amazon>.  The defendant is not scheduled for sentencing until March 30, 2022, but in that case as well, the defendant admitted to reselling items obtained by fraud.

Given the apparently typical case involving Amazon return fraud, Dr. Riyaz's case is extraordinary and mitigated by (1) the primary role of his mental health condition in precipitating the offense conduct and (2) relatedly, the absence of any profit motive common to the other cases.  A noncustodial sentence of supervised probation, or one involving an alternative to a term of imprisonment, would be both sufficient and not greater than necessary in this case and would avoid an unwarranted sentencing disparity in relation to more aggravated criminal conduct in otherwise substantially similar prosecutions.

**Conclusion**

Based on all of the information presented above and in Attachment A, and consistent with the factors enumerated in 18 U.S.C. § 3553, it is respectfully submitted that the advisory Guidelines significantly overstate the appropriate sentence in this case and a substantial variance is warranted. In the case of Dr. Riyaz, a probationary sentence would be sufficient but not greater than necessary to accomplish the objectives of sentencing. In the context of such a sentence, the Court has wide latitude to consider and impose additional conditions as alternatives to a period of imprisonment, including intermittent or home confinement, should it believe such necessary. The Court also may consider requiring extensive community service whereby Dr. Riyaz can continue to put his specialized professional skills to use on behalf of underserved communities. Finally, the Court may, and in this case should, mandate continued and uninterrupted mental health treatment as directed by Dr. Riyaz's treating psychiatrist for the duration of any period of supervision.

Dated:  March 15, 2022                                  Respectfully submitted,

                                                        */s/ Joshua Siegel*

                                                        Joshua Siegel (VA73416)
                                                        Daniel Grooms (*pro hac vice*)
                                                        COOLEY LLP
                                                        1299 Pennsylvania Ave., Ste. 700
                                                        Washington, DC 20004
                                                        Tel:  (202) 842-7800
                                                        Fax:  (202) 842-7899

                                                        *Counsel for Defendant Farhaad Riyaz*

20

**CERTIFICATE OF SERVICE**

I certify that on March 15, 2022, a copy of the foregoing was filed with the Clerk of the

Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


Dated:  March 15, 2022                          _/s/ Joshua Siegel_____

                                                Joshua Siegel
                                                Daniel Grooms (*pro hac vice*)

                                                *Counsel for Farhaad Riyaz*