IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FARHAAD RIYAZ,<br><br>Defendant. | Case No. 1:21-cr-264<br><br>The Honorable Leonie M. Brinkema<br><br>Hearing: March 22, 2022 |

## UNITED STATES' SENTENCING POSITION

The United States of America, through undersigned counsel, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G."), hereby submits its position on the sentencing of Farhaad Riyaz ("the defendant" or "Riyaz"). The defendant comes before the Court for sentencing after pleading guilty to one count of mail fraud, in violation of Title 18, United States Code, Section 1341. The United States has no objection to the Probation Officer's calculations of the defendant's Sentencing Guidelines range of 21-27 months, as set forth in the Presentence Investigation Report ("PSR"). *See* PSR ¶¶ 61-70. For the reasons explained below, the United States submits that a variant sentence of 10 months of imprisonment would be reasonable and appropriate in consideration of all of the factors set forth in 18 U.S.C. § 3553(a). The government also recommends that the defendant pay a criminal fine of $50,000 and serve a term of supervised release. Because of the full payment of early restitution, the United States seeks no order of forfeiture in this matter.

### BACKGROUND

From March 2017 through the execution of a search warrant on his residence in June 2020, the defendant, a wealthy and successful doctor with no financial need, willfully engaged in an

intricately planned scheme to defraud Amazon.com of nearly $400,000. The defendant's scam was not a one-off lapse of judgment, or a short burst of manic behavior. Rather, it was calmly sustained, carefully planned, and coolly executed on a regular basis—fraudulent return after fraudulent return—for over three years, with no sign of stopping, despite warnings from Amazon. Only a Fairfax County police search warrant ended the defendant's criminal conduct.

By day, he was a highly successful dermatological surgeon, licensed in dozens of states, operating on patients at multiple medical practices. By night, the defendant planned and executed the fraud from the basement of his home in McLean, Virginia. His double life went on for at least three years. The defendant's mental health did not prevent him performing professionally at the highest level. It also did not adversely affect his finances. To the contrary, he had the skill and shrewd judgment to amass wealth, making smart financial decisions and good investments. The defendant was so successful, that at age 34, he has already amassed extensive financial resources. PSR ¶¶ 103-104.

The defendant had no financial need to engage in this scheme. He did not do it to acquire necessities, such as medical devices or toys for his children. Rather, he schemed to acquire personal luxury items at little to no cost to himself—items like rare guitars, home theater systems, fancy toilets for his home, adult road bikes, and a $47,000 chandelier. He used these items in his home or otherwise added them to his personal collection in his basement, partially pictured below, in Figure 1.



*Figure 1. High-end guitars in cases, bikes in Riyaz's basement (high-end road bikes behind).*

Inside these beautiful more-than-a-dozen new cases were many rare and special edition guitars the defendant stole from Amazon and its third-party retailers. Fairfax County police photographed the guitars inside the cases, this being one of them:



*Figure 2. Red Fender Stratocaster found in Riyaz's basement.*

To understand the astonishing level of the defendant's planning and the brazen nature of his scheme to obtain adult toys, a few examples are worth a closer look. A common theme running through the examples discussed below is that the defendant had to engage in multiple premeditated steps to carry out the fraud. Each time, he had to research the item he wanted to steal. He had to order it and pay for it and have it shipped to his house. He had to carefully unbox it so as to avoid damaging the packaging materials needed for the return fraud.

In the meantime, he had to purchase an item similar enough in weight, size, color, and superficial quality such that it would have a reasonable chance to fool a person working in Amazon's returns department. He would have to obtain both items at relatively the same time. After the high-quality item arrived from Amazon, Riyaz would lie to Amazon to make a false claim about it not arriving on time, or otherwise not matching the on-line description. After obtaining return authorization from Amazon, he would have to pack up the cheaper item in the same or similar packaging that the nicer item had arrived in. Then he'd have to arrange for a common carrier to pick up the substitute item and return it to Amazon. All the while, Riyaz would monitor his credit cards to make sure that charges were reversed, and he got his money back. He also pestered Amazon for his money back. Then he'd start it all over again. It must have been quite a thrill.

Riyaz did the crimes with zeal and a sense of impunity, despite Amazon shutting down his accounts and warning him to knock it off. Here are a few representative examples.

*Example A -- Boosted Electric Skateboard, $1,499. July 21, 2017.*

Below is a pictorial comparison of a $1,500 electric skateboard Riyaz ordered from Amazon, and the unbranded item he returned in its place.

*Figure 3 (below). Boosted skateboard ordered from Amazon at left. At right, cheaper item returned to Amazon.*



*Figure 4 (below). High-end Boosted skateboard found in Riyaz's residence.*



*Example B – Fender Rarities Flame Maple Top Stratocaster, $2,499, June 2, 2020.*

Below, in figures 5 and 6, are pictorial comparisons of a fraud Riyaz executed on June 2, 2020, by which he returned a cheap Squier Stratocaster available on-line for $250, in place of a $2,500 American-made Fender Rarities Flame Maple Top Stratocaster he had bought from Amazon, then fraudulently returned.

*Figure 5, below, on-line comparison of items.*




*Figure 6, below. At left, item recovered at search of Riyaz's residence. At right, cheaper item he actually returned to retailer.*




*Example C -- Sony 4K HDR Laser Home Theater Video Projector, $37,097.88,*

*August 15, 2019.*

Riyaz ordered a $37,097 laser home theater projector, but returned an item that cost only around $2,000, a Sony 1080p 3D SXRD Home Theater/Gaming Projector. He obtained a full refund for the $37,000 item, which was later found in his home during execution of the search warrant.



*Figure 7, above, shows the $37,000 laser projector found in Riyaz's home. The inset at bottom right is the cheaper item he returned to Amazon. Inset at top right is the model number of the item seized from his home, which matches his Amazon order and return.*

7

*Example D - Schonbek DV3636A Swarovski Lighting Da Vinci Pendant Light, Stainless Steel ($47,105.00), January 6, 2020.*

Riyaz drew special scrutiny from Amazon when he escalated his criminal behavior and went to extraordinary lengths to attempt to defraud the company of a $47,000 chandelier. The same day that Riyaz received delivery of the $47,000 Da Vinci Chandelier he purchased Amazon, he initiated the return process, claiming "inaccurate website description." The shipment he received from Amazon weighed 317 pounds. Riyaz sent back, instead, a different Swarovski model, Schonbek Lighting - DV1515S, which has a retail value of approximately $10,000. The Amazon facility weighed the returned shipment and found that it weighed 39 pounds. Even though Amazon denied this return, Riyaz was relentless in hounding them to reverse the charge, complaining of the delay and of having to bear interest costs on his credit card.



*Figure 8. Photograph of returned chandelier*.

Needless to say, there are many more examples one could explore, including four $4,400 Toto toilets with electric bidets; laser tag sets; snowboards; an $8,500 Kestrel carbon fiber road

8

bike; and bike helmets. Altogether, the defendant attempted to inflict nearly $400,000 of loss on Amazon, succeeding to the tune of $312,964.38. He would have kept going, had police not stopped him.

These numbers are significant, and do not reflect a minor, aberrant episode, or simply a manic burst of irrational behavior. They reflect hundreds of choices. The crime evinces extreme care and planning in order to obtain expensive luxury items at little to no cost. The packaging and the weight of the chandeliers, bikes, guitars, and other luxury items involved shows that the scheme took real dedication to execute (and not insignificant physical stamina). It was, for Riyaz, very much a vocation, and a profitable one, and probably a fun one that he looked forward to doing after a day at work. Moreover, as the PSR notes, he appears to have executed smaller schemes with respect to three other retailers. *See* PSR ¶ 26.

## GUIDELINES CALCULATION AND IMPOSITION OF SENTECE

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); s*ee also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).

The base offense level of 7 and loss amount are not in contention, so that a 12-level enhancement is proper under U.S.S.G. § 2B1.1(b)(1)(G). The United States concurs with the Probation Officer's application of the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and, in accordance with the plea agreement, hereby moves for the additional one-point reduction under U.S.S.G. § 3E1.1(b). The resulting guidelines range is 21-27 months,

based on a criminal history category of I.

Under 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61.

## ARGUMENT

**A 10-Month Sentence of Incarceration Would Serve the Goals of Federal Sentencing**

The defendant, through counsel, has asked the United States Attorney's Office to agree to recommend a variance downward from the guidelines range due to the defendant's mental health diagnoses, his early payment of full restitution, and other facts. After careful consideration, the United States agreed that recommending a variance is appropriate—but certainly not to the extent that the defendant wants: a complete pass from jail. For the reasons explained below,[1] a ten-month sentence of imprisonment will most appropriately serve the goals of federal sentencing under 18 U.S.C. § 3553.

The defendant's three-year, sustained pattern of criminality-for-personal gain calls for a

---

[1] The undersigned Assistant United States Attorney is constrained in this sentencing position from fully arguing the government's views due to the defendant's desire to seal his mental health expert report and not to have any mention of his specific conditions made in public. Suffice it to say, at the sentencing hearing, the United States will be prepared to address contents of the expert report, the defendant's diagnoses, and usual presentation of such conditions as explained in the Diagnostic and Statistical Manual and or other literature, if the Court deems it helpful.

10

carceral sentence in order to deter him from future criminal conduct, and to deter others who are, or are tempted to, engage in this kind of scheme. It is also necessary to promote respect for the law and to reflect the seriousness of what he did.

This was a rich man's crime. It was sustained over three years, each execution requiring forethought, planning, and no apparent hesitation. Make no mistake, the defendant felt *entitled* to do these crimes. He was actually indignant when Amazon denied him his $47,000 refund for the chandelier. He demanded his money repeatedly, despite knowing he was victimizing Amazon. His excuse that the victim this case had actually defrauded him first at some point in the distant past, and that is what began his three-year-campaign of defrauding Amazon, should give everyone real pause. After all, what is to stop the defendant from doing something like this again, if somebody crosses him, whether in reality, or in his own perceptions of reality?

One thing is for sure, a no jail sentence would send him the exact wrong message. It would risk telling him that he can simply buy his way out of jail after a three-year crime spree. He has demonstrated the financial resources to pay full and early restitution for his crimes. He had the resources to commission an expert report and provide it to the Court in aid of his sentencing, as is his right. He has also exercised his Sixth Amendment rights to the fullest, to hire able counsel who has vigorously represented him, obtaining a variance from the United States Attorney's Office.

But, at the same time, this defendant needs to contemplate his conduct not just from the comfort of counsel's office, or in his home while on probation, or in the offices of therapists he pays. He should spend some time in the custody of the Bureau of Prisons, where he is not, for once, in complete control. There, he should contemplate *his choices* that put him there. That period of forced reflection, that humbling, that grappling with himself, and, importantly, the memories of

it he will carry forward for the rest of his life, are what are most likely to deter such a willful man from reoffending down the road.

Law-abiding people who want high-end carbon fiber road bikes save their money to buy one. Law-abiding people who want to build a collection of rare guitars budget their funds to pay for them or make do with less fancy models. Not this defendant. He intentionally and knowingly built his collections of adult toys at the expense of his victim. He did all of this while prospering and thriving as a highly successful doctor and investor. Whatever mental health issues he has, they certainly don't excuse him from the choices that landed him here.

The government is mindful that the defendant has paid full restitution, has attempted to cooperate, and has offered mental health as a mitigating factor. That is why the government agrees to recommend a variant sentence of ten months, which is more than 50% below the low end of his guidelines range. By the same token, the government firmly believes that no defendant should be allowed to purchase his or her way out of jail. *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009)( "[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.").

Moreover, general deterrence, "the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow," will not be achieved absent some meaningful term of imprisonment. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). Indeed, this Court must consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized."). A custodial sentence is thus necessary to send a message to

12

others who are closely watching that this conduct will be caught and punished significantly. It is also necessary for just punishment and to promote respect for the law.

## IV.  CONCLUSION

Based on the 18 U.S.C. § 3553(a) factors, a custodial sentence of ten months, a fine of $50,000 (the approximate cost of the chandelier), a $100 special assessment, a final order of restitution, and a three-year term of supervised release, are appropriate in this case.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____
Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2022, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

A copy has also been sent via email to:

Shanna M. Koch
United States Probation Officer
Shanna_Koch@vaep.uscourts.gov

                /s/
Russell L. Carlberg
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3868
Facsimile: (703) 299-3980
Email: Russell.L.Carlberg@usdoj.gov