```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                       ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES OF AMERICA,  :    Criminal Action No.:
 4                              :    1:21-cr-264
          versus               :
 5                              :
     FARHAAD RIYAZ,             :    Tuesday, March 22, 2022
 6                              :
               Defendant.      :
 7   --------------------------x

 8        The above-entitled sentencing was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
 9   This proceeding commenced at 9:53 a.m.

10                     A P P E A R A N C E S:

11   FOR THE GOVERNMENT:    RUSSELL CARLBERG, ESQUIRE
                            OFFICE OF THE UNITED STATES ATTORNEY
12                          2100 Jamieson Avenue
                            Alexandria, Virginia  22314
13                          (703) 299-3700

14   FOR THE DEFENDANT:     DANIEL GROOMS, ESQUIRE
                            JOSHUA SIEGEL, ESQUIRE
15                          COOLEY LLP
                            1299 Pennsylvania Avenue, NW
16                          Suite 700
                            Washington, D.C.  20004
17                          (202) 842-7800

18        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

19

20

21

22

23

24

25
                                                              1
```

```
 1                    P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Criminal Case 21-264, United

 3    States of America versus Farhaad Riyaz.

 4            Would counsel please note their appearances for

 5    the record.

 6            MR. CARLBERG:  Your Honor, good morning again.

 7    Russell Carlberg for the United States.

 8            THE COURT:  Mr. Carlberg.

 9            MR. GROOMS:  Good morning, Your Honor.

10    Daniel Grooms and Joshua Siegel on behalf of the defendant,

11    Farhaad Riyaz.

12            THE COURT:  All right.  Mr. Grooms, this matter

13    comes on for sentencing.

14            Have you had enough time to go over the

15    presentence investigation report yourself and with your

16    client?

17            MR. GROOMS:  I have, Your Honor, yes.

18            THE COURT:  In particular, did you carefully go

19    over pages 22 through 24, which lists all the conditions of

20    supervision?

21            MR. GROOMS:  We did, Your Honor, yes.

22            THE COURT:  All right.  Are there any factual

23    corrections, changes, additions or deletions you want made

24    to the report?

25            MR. GROOMS:  No, Your Honor.
```

1          THE COURT:  Then as you know, the probation office

2     calculated the offense level here as a Level 16.  Your

3     client has a criminal history of one.  The advisory range is

4     21 to 27 months of incarceration.  There's a one- to

5     three-year period of supervised release.  The fine range is

6     $10,000 to $779,298.18.  Restitution in this case is

7     $312,964.38, and a $100 special assessment.

8          And my understanding is that you're not disputing

9     any of those calculations.

10          MR. GROOMS:  That's correct, Your Honor.

11          THE COURT:  All right.  And do I understand

12     correctly that the restitution has been completely paid?

13          MR. GROOMS:  It has, Your Honor, yes.

14          THE COURT:  So we'll do the same thing in this

15     case that we just did previously.

16          I assume there's a restitution order?

17          MR. CARLBERG:  We have executed this fully and are

18     prepared to hand it up.

19          THE COURT:  All right.  And, again, that will be

20     clearly reflected both in the minutes of today's hearing, as

21     well as on the judgment order that restitution has been

22     paid.

23          MR. GROOMS:  Thank you, Your Honor.

24          THE COURT:  All right.  And, Counsel, I've gone

25     over all the paper in this case, and obviously this is a

                                                              3

1    very difficult case because of the defendant's extensive

2    well documented mental health issues, which we don't need to

3    go into great detail on the public record because it's well

4    documented on the papers.

5            On that basis, the Government has requested and

6    agreed to a variant sentence.  The Government has

7    recommended in this case a sentence of ten months of

8    incarceration followed by a period of supervision, a fine of

9    $50,000, and that's -- and, of course, the restitution,

10   which has been taken care of.

11           Was there anything you wanted to add to that,

12   Mr. Carlberg?

13           MR. CARLBERG:  No, Your Honor.  I simply would be

14   prepared to answer any points that the -- you know, to --

15   there's some points in the defense brief and so forth that,

16   you know, I might have some issues with.  But I think

17   overall that's absolutely correct, and the Government fully

18   briefed its position and is recommending the ten months, and

19   the $50,000 fine is appropriate in this case given all the

20   factors.

21           Did you want me to address --

22           THE COURT:  What are the issues that trouble you

23   or that you want to clarify?

24           MR. CARLBERG:  Yeah.  Your Honor, if I may have

25   one moment just to bring my papers up here.

                                                              4

1            Your Honor, I would note that I did -- I was able

2     to check with the Bureau of Prisons in terms of --

3     Mr. Grooms was -- allowed me to send the presentence

4     investigation or report to the Bureau of Prisons to make

5     sure that the defendant can receive the same medications and

6     therapy if he were to serve a term of custody and a term of

7     imprisonment in their custody, and they indicated that they

8     could accommodate him, that these medications were

9     available.

10           I do have an email from Diana Lee at the Bureau of

11    Prisons to that effect, and I could hand that up to the

12    Court.  And I have a copy for Mr. Grooms as well.  One

13    second.  Let me hand also the -- that's the Bureau of

14    Prisons also sent me -- it's a list of approved First Step

15    Act programs.  And they've, you know, indicated those

16    programs are fairly extensive in terms of mental health

17    specific programs.  So --

18           THE COURT:  Are these -- I'm sorry.  Are these

19    available at all facilities or only at certain specialized

20    facilities?

21           MR. CARLBERG:  I don't know the answer to that

22    question, Your Honor.  I don't know.  I didn't ask that

23    specific question in terms of specific facilities.

24           But, Your Honor, I would imagine a candidate such

25    as Mr. Riyaz would be a good candidate to be recommended to

                                                             5

```
 1    Butner, for instance, where they do have everything, and
 2    they do have a camp there.  So since he's most likely
 3    low-risk -- low security risk, I imagine a Court's
 4    recommendation to a camp at Butner might be well received by
 5    the BOP.
 6              And, Your Honor, I would note that the main
 7    concerns here are that the Government believes that a
 8    completely probationary variant sentence of no jail would
 9    send the wrong message to this defendant, who, as the Court
10    said in the previous case, you know, there is -- in white
11    collar crimes, there is a level of thinking and complexity
12    and planning involved, and this case has it in spades
13    because of the -- that's what the Government called out.
14              THE COURT:  Well, but this case has a very unique
15    and very sad factor, and that is the type of mental illness
16    that this defendant suffers from is one that almost takes
17    over traditional volitional conduct.  Not to the level of,
18    you know, criminal insanity, which would be a completely
19    different ball game, but basically when someone is in that
20    particular, you know, manic state, they are just out of
21    control.  And the conduct here going on for years -- I mean,
22    the troubling factor here is that a doctor would not
23    recognize -- both because of the family history and because
24    of his, you know, training, would not have recognized that
25    he suffered from this problem.  But, you know, the old
```

                                                              6

1    saying, doctor, heal thyself.  I mean, unfortunately -- and

2    this is a perfect example of that that is that Mr. --

3              MR. CARLBERG:  Your Honor, the Government doesn't

4    quibble with that.  But I would note that manic episodes,

5    according to the DSM-IV and other sources that I've looked

6    at, you know, they don't typically last for three and a half

7    years.  I mean, they come and go and they're interspersed

8    with periods of depression.  And I don't think it completely

9    explains the conduct and that there were choices involved

10   here.

11             But clearly the Government recommends a variance

12   because it is also concerned about the mental health issue

13   and believes that that does provide some explanation for the

14   conduct here and is deserving of some variant sentence, and

15   a substantial one.

16             But, nevertheless, the Government believes that

17   the defendant could do some period of time in the Bureau of

18   Prisons and receive treatment -- receive uninterpreted

19   treatment and receive counseling and medication, and that

20   would give him some opportunity to understand the gravity of

21   what he has done outside of the confines of, you know, a

22   non-custodial sentence.

23             THE COURT:  All right.  Thank you.

24             Mr. Grooms.

25             MR. CARLBERG:  Thank you very much.

                                                              7

1          MR. GROOMS:  Yes, Your Honor.

2          Just as a preliminary matter, we do have some

3     additional letters to pass forward to make part of the

4     record.  They were received after the submission of our

5     sentencing papers.

6          THE COURT:  All right.

7          MR. GROOMS:  And I'll just note, Your Honor,

8     those -- the first of those documents Dr. Riyaz's daughter's

9     condition and her need.

10          THE COURT:  Which is also going to be a factor the

11     Court will consider.

12          MR. GROOMS:  Thank you, Your Honor.

13          The second recognized is some of his extensive

14     volunteer work that he has performed.  And the other

15     recognized what the Court has acknowledged, that this

16     behavior is, to quote those letters, a bizarre deviation and

17     creates cognitive dissonance when you look at Dr. Riyaz, the

18     person and the doctor and the life he has led, other than

19     the conduct before this court.

20          And I won't belabor the point, Your Honor.  I will

21     note that we all agree a guideline sentence is not warranted

22     here, would not be appropriate here.  And I appreciate that

23     the Government has recognized that fact.  We do disagree on

24     the extent of a variance that's appropriate given the

25     circumstances here.  And the factors in 3553(a).  I think

1    the important question is why this conduct occurred, and I

2    think the Court recognizes that.

3           I will -- in response to some of the points the

4    Government made in its papers, I will note that this was not

5    done for profit.  I don't think anyone suggests that it was.

6    This was not behavior done for greed, to have items to use

7    them.  The Government's own submission and the photographs

8    included shows items that were kept unused in his basement.

9    They were still in their original packaging.

10          And then finally, this wasn't the conduct of

11   someone seeking to be a high-end collector of items.  The

12   Government suggested that, but the photos of the expensive

13   items that Dr. Riyaz had, including the guitar, someone

14   collecting items like those would prominently display them

15   in a home or an office or somewhere else.  That was not the

16   case here.  They were stacked in the basement like luggage

17   at an airport baggage claim.

18          It's not a mystery, it's not in debate why this

19   conduct occurred.  The record shows a clear reflection of

20   that in Attachment A of our submission papers; it goes into

21   great detail on that.  I won't go through everything, but I

22   will note two things.  One, you see the conduct is not just

23   consistent, but is on all four with the classic

24   manifestations of this condition:  Excessive spending, a

25   sense of grandiosity, compulsive behavior and hoarding, a

9

1  sense of persecution and delusional thinking.  All of those

2  things are consistent with an episode.

3          And I will respond to one thing Mr. Carlberg said.

4  I could pass forward, if the Court wished and make part of

5  the record, research on the course of episodes in this type

6  of disorder, but the evidence is from studies that the

7  average episode lasts for months, and that in more than a

8  quarter -- or approximately a quarter of the cases, I

9  apologize, in approximately a quarter of cases, the episodes

10  go on for a year or more.  So it's not at all uncommon to

11  have expensive periods of time where someone is in a state

12  that would lead to this type of conduct and this type of

13  behavior.

14          This understanding of the reason, what drove the

15  behavior -- and I think the Court recognizes, it's not an

16  effort to deflect responsibility.  Dr. Riyaz understands

17  he's responsible for this conduct, he understands there are

18  consequences for that.  But as to what consequences are

19  appropriate, as to what consequences can address this

20  conduct appropriately, we would submit that a lengthy

21  sentence of imprisonment, and ten months of imprisonment

22  would be a lengthy sentence of imprisonment, is not

23  necessary to accomplish deterrence, punishment,

24  rehabilitation whatsoever in this case.

25          The Government asked in its papers what's to stop

10

1    Dr. Riyaz from engaging in this conduct in the future to

2    repeat what he did in the past.  The simple question is,

3    what has changed since 2017, or, indeed, since 2020.  And

4    that's treatment.  The answer is the treatment that has been

5    successful for the past two years would be interrupted by a

6    sentence of imprisonment.

7           And notwithstanding what Mr. Carlberg says, we

8    don't dispute BOP would say that they have the ability to

9    provide the same medications.  The therapy and the treatment

10   that Mr. Riyaz has received has been remarkable in its

11   effectiveness and its success.  I think that's documented in

12   the paperwork.  And I would submit it's not realistic to

13   expect that that would continue uninterrupted during a

14   period of lengthy imprisonment.

15          I would note there have been consequences in this

16   case to date.  There have been significant personal

17   consequences for Dr. Riyaz, for his family.  The collateral

18   consequences on people who are victims of this offense as

19   well, not in the way that Amazon is, but are victims of

20   Dr. Riyaz's conduct, and he recognizes that.  He can speak

21   to that more eloquently than I can myself.

22          There have been professional consequences.

23   Dr. Riyaz has lost employment.  He has lost, at least

24   temporarily, his ability to practice in many jurisdictions.

25   Frankly, imprisonment could make those consequences

                                                        11

1    permanent.

2              And there have been financial consequences to

3    date.  He has lost significant income, as reflected in the

4    presentence report.  There have been significant costs to

5    date well above the payment of full restitution, well above

6    the forfeiture in this case that Dr. Riyaz has not contested

7    in his plea agreement.

8              And I would note two things, Your Honor.  There

9    are two unaddressed bases for variance in the Government's

10   papers, or not fully addressed, that we would submit warrant

11   a significantly greater variance than the Government

12   suggests and would make the appropriate sentence here

13   probation.

14             The first are the effort to cooperation and

15   substantial assistance.  Those were documented in our

16   papers, we won't go through the details of that conduct, of

17   those efforts.  But while they may not have given rise to a

18   motion by the Government, we submit they are appropriate to

19   take into account when determining the extent of a variant

20   warranted in this case.

21             And then, finally, the need to avoid unwarranted

22   disparities.  While there are a few cases -- there are no

23   cases that are like this one in terms of what gave rise to

24   the conduct.  But in terms of the type of conduct, there are

25   a handful of cases that reflect that type of conduct, and I

                                                              12

1    would point out the *Sides* case, which we cited and submitted

2    to the Court in our papers, reflects similar conduct, albeit

3    more aggravated and that it was done for profit, it was not

4    done with the mitigating circumstances that exist here.

5    It's a case in the Northern District of Florida which

6    resulted in a sentence of probation with extensive community

7    service.  We would submit that a similar sentence is

8    warranted here to avoid unnecessary and unwarranted

9    disparities in this case.

10          Your Honor, ultimately the appropriate sentence we

11    would submit is one of probation, one that includes a

12    mandate of a continued extensive treatment, the treatment

13    that Dr. Riyaz has been receiving.  This is an ongoing

14    condition.  It won't be cured, it wouldn't be punished into

15    submission.  It does need to be stabilized, and it does need

16    continued ongoing treatment.  Dr. Riyaz recognizes that.

17          And if the Court in any way disagrees and believes

18    that some loss of liberty is an appropriate sanction,

19    respectfully, we disagree, but we would say there are ways

20    the Court can impose that while not interrupting that

21    treatment through home detention, through intermittent

22    confinement, through something along those lines.

23          But we would submit that an appropriate sentence

24    here would take into account what gave rise to this conduct

25    and how best to both deter it and, in fact, prevent it in

13

1    the future.

2            Thank you, Your Honor.

3            THE COURT:  All right.  Was there anything,

4    Mr. Carlberg, you wanted to respond with?

5            MR. CARLBERG:  Your Honor, I don't want to

6    quibble.  I just would say that to say it's not for profit I

7    think is a little inaccurate when somebody is getting $2,500

8    guitars for a price of $250 and amassing a collection in the

9    basement.  And whether they're prominently displayed or not,

10   they were there in his basement for him to look at and use

11   and enjoy.  And there was a willful aspect to this.  He was

12   able to carry on this scheme at the same time he was

13   performing surgeries all over the place and performing at a

14   very high level.

15           The Government -- the Government is not really in

16   a position to get into the details of the DSM-IV and of

17   Dr. Voss's report, but I would submit that a three-year

18   manic episode seems a little hard to buy in this case, but

19   the Government understands the need to variant and

20   understands that an appropriate sentence here should not be

21   too long of incarceration, but still believes firmly that a

22   request for some period of incarceration is appropriate, if

23   nothing more than also for general deterrent purposes.

24           The defendant in North Carolina that the defense

25   points to apparently got no jail at all, and that's not

1    deterring people.  And other people are watching this case,

2    as Mr. Grooms pointed out, and there is the concern for

3    general deterrence.  And just because the victim is Amazon

4    doesn't mean that somebody has a right to rip it off and not

5    serve any time.

6         THE COURT:  Well, my understanding from the

7    presentence report is that although Amazon was the victim

8    involved in this case, that there is documented instances

9    going back to 2014 of this pattern of making purchases over

10   the internet and then returning the item but the same item

11   doesn't go back.

12        MR. CARLBERG:  That's right.

13        THE COURT:  In other words, it's a swap.  So my

14   understanding is that Nordstrom, Nike and several other

15   retailers were also affected by this kind of conduct, and

16   apparently this is something that you can go on the internet

17   now and find out ways in which to scam Amazon and other

18   online retailers with these false return schemes.

19        So I'm not sure that just focusing on Amazon as

20   the victim is an accurate picture of what went on here.

21        MR. CARLBERG:  That's absolutely correct, Your

22   Honor.  And there was other conduct.  Unfortunately, those

23   retailers didn't document it as well as Amazon.  But that

24   was pretty clear from the evidence that he engaged in

25   similar return conduct with respect to Nike and Mr. Porter

15

1    and others.

2              THE COURT:  All right.

3              MR. CARLBERG:  Thank you, Your Honor.

4              THE COURT:  Mr. Grooms, anything further?

5              MR. GROOMS:  No, Your Honor.

6              I would note, we don't dispute that whatsoever.

7    It is the case that Dr. Riyaz spiraled out of control.  And

8    I do not say that in a way to say that it was not

9    volitional, but out of control in that his conduct went far

10   much beyond any sense of proportion or scale because he had

11   a warped sense of proportion and scale.

12             THE COURT:  And you realize, though, that if

13   Nordstrom or Nike or one of those other vendors had brought

14   charges earlier, it might not have escalated to the extent

15   that, you know, he was going on Amazon and getting, you

16   know, what, 30, $40,000 pieces of equipment, chandeliers and

17   home videos -- home theater systems and then, you know,

18   swapping a much less valuable item in the return process.

19   So, yeah, it escalated, if anything.

20             MR. GROOMS:  It's absolutely correct that it

21   escalated and spiraled, as I said.  And it did start with

22   Amazon, it included those other retailers as well, I will

23   say.  And it is, it's a tragic point that this got to the

24   place it did.

25             Dr. Riyaz is grateful that an intervention

                                                          16

```
 1    occurred here and he had the opportunity to take steps to
 2    address what was untreated, and, as the Court noted,
 3    unfortunately unrecognized, even given the history in this
 4    situation.  It is good that it has been addressed.  It is
 5    unfortunate it was not sooner so the harm would have been
 6    lesser both to the retailers and also to Dr. Riyaz and his
 7    family.
 8             THE COURT:  All right.  Dr. Riyaz, come up to the
 9    lectern.  This is your opportunity to say anything you would
10    like the Court to consider before sentence is imposed.
11             THE DEFENDANT:  Your Honor, thank you for the
12    opportunity to speak and to consider my perspective.
13             You know, I know, and everyone in this courtroom
14    knows that I made a terrible mistake.  Between 2014 and up
15    until 2020, I had disputes with Amazon over items that I
16    purchased and paid for but never received.  Because of my
17    mental health condition, which was not diagnosed nor treated
18    at the time, I wrongly believed that Amazon had singled me
19    out for mistreatment.  When my efforts to resolve the
20    matters were not successful, I engaged in a vendetta,
21    spurred by powerful symptoms that caused me to believe that
22    the most important thing in the world was to get even.  I'm
23    truly sorry to Amazon and anyone else harmed by my actions.
24             I come before the Court today a fundamentally
25    different man.  In 2020, I sought medical help to understand
```

17

why I would engage in such a behavior.  I began to see a
psychiatrist who diagnosed me with a significant mental
illness.  With the benefit now of two years in recovery, I
recognize that my illness clouded my judgment and convinced
me that I was being persecuted by Amazon and predisposed me
to taking bizarre risks and seeking revenge far out of
proportion than what was done to me.  My actions were not
based in greed, nor performed for a thrill, nor did I even
enjoy doing them.  They were compulsions induced by mental
illness.

        I now know that Amazon, nor was any other
retailer, trying to persecute nor cheat me.  And even if
someone does try and cheat me, I know it is wrong for me to
try to retaliate.  I'm endlessly grateful to the detectives
and to Mr. Carlberg for treating me with kindness and
respect, for helping me recognize this problem before it
could cause further damage to Amazon, myself or my family.
I'm also thankful that my illness was identified and treated
before it could affect my patients.

        People in my life have been so astonished by this
behavior because they knew me as someone who treats others
with care and compassion.  Be it family, friends,
colleagues, patients or even strangers.  As a surgeon, a
loving husband and a father to a beautiful girl, the
majority of my day is spent making people's lives better.

18

1          I've reflected deeply upon how this behavior was

2     missed by me and my family, and I've educated my family on

3     the signs and symptoms of my condition, and we've created a

4     system where my family members help monitor my spending and

5     sleeping patterns to detect a variance in advance.  I'm

6     committed to make sure that nothing like this ever happens

7     again.

8          I'm sorry to Amazon.  I ask you for your

9     forgiveness, and I hope that my assistance will help others

10    from engaging in similar behaviors.  I'm sorry to my

11    colleagues for tainting the reputation of physicians.  And

12    I'm sorry to my patients, as their ongoing treatment against

13    cancer may be disrupted during the most difficult fight of

14    their lives if I'm incarcerated.  Many of my patients are

15    uninsured, and the thought that they might lose

16    urgently-needed care because of my actions is unbearable to

17    me.

18         I'm sorry to my family and my wife whose good name

19    I've tarnished.  And I'm most sorry to my daughter, whose

20    future I've jeopardized.  She means the most of everything

21    in my life, and as you know, she's developmentally delayed,

22    and I'm tormented by the idea of losing a single day of

23    practicing her speech or missing a single night of reading

24    books together.  I'm a healthier and better father now than

25    I was before my mental health problem was discovered, and I

                                                              19

```
 1    promise never to jeopardize her future again.

 2            I accept that there will be discipline from my

 3    professional communities in addition to any sentence that's

 4    imposed today, but I hope that these can be done in a

 5    compassionate way that take into account how I've strived to

 6    do good for my community, how I've taken steps to

 7    maintain -- how I've taken steps to eliminate the root cause

 8    of my behavior and maintain proper health and what I've done

 9    to make amends.

10            I stand today before you, Judge Brinkema, having

11    acknowledged my wrongs and having sought to rectify them to

12    the fullest of my abilities.  I ask you to consider the

13    good -- I ask you to consider the good that I'm capable of

14    doing and to consider the incarceration could result in a

15    permanent loss in my ability to treat cancer patients or

16    provide for my daughter for the rest of my life.

17            I believe this would be a great loss for me and

18    the community.  Volunteering and helping the needy,

19    especially those with poor access to care, gives me the

20    feeling that perhaps I'm spreading good in this world and

21    undoing some of the wrong I have done.

22            I don't want to see others suffer from my mistake

23    that I believe can be fixed.  I've resolved to do better for

24    the rest of my life, and I'm asking for a second chance and

25    an opportunity to continue my ongoing rehabilitation.  I ask
```

                                                              20

1    earnestly for leniency to allow me to continue my mental

2    health recovery without interruption and to provide for my

3    community and family to prove that I've learned from my

4    mistakes.

5           Thank you very much, Your Honor.

6           THE COURT:  Well, Dr. Riyaz, your case is a very

7    troubling case.  Again, I recognize the significant mental

8    health problems that you have, and I recognize the

9    significant relationship that it had -- that mental health

10   condition had to your conduct.  That, by itself, would be a

11   legitimate ground for a variance.  In addition, I also am

12   concerned about your very young child at a very vulnerable

13   age and the impact that being separated from you for a

14   significant period of time could have.

15          At the same time, I'm also concerned, and the

16   Government is correct in pointing out the need, particularly

17   in white collar crimes, to make it clear to people if they

18   engage in such conduct, that there are consequences.  And,

19   in particular also, not to set some sort of an image that

20   the courts allow people who are able to pay their

21   restitution, you know, upfront to somehow get a better shot

22   at a more lenient sentence.  That would not go well in terms

23   of the appearance of justice from the courts.

24          All these are factors that have to go into the

25   sentencing decision.  But, at the end of the day, I'm

1    satisfied that a significant sentence of incarceration would

2    not be appropriate in this case, and I feel therefore that a

3    significant variance is appropriate.

4            The sentence of the Court is that you will serve

5    one day in the custody of the Bureau of Prisons.  You'll

6    serve it today at the lockup.  I want to make sure you have

7    the experience of what it's like to hear that cell door

8    clang behind you, of having to sit on a hard metal bench.

9    And being behind bars it will give you a day to sort of

10   think about what's happened to you and what you're facing if

11   you should re-engage in such conduct.

12           The one day in the custody of the Bureau of

13   Prisons will be followed by a period of three years of

14   supervised released.  The terms and conditions of

15   supervision are, first of all, your uniform good behavior.

16   That means you cannot violate any federal, state or local

17   laws, and that includes traffic laws; do you understand

18   that?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  Secondly, you have to follow all the

21   conditions of supervision, which will be printed on the

22   judgment order.  They were also reflected in the pages 22

23   through 24 of the presentence investigation report, which

24   you did go over with your counsel; correct?

25           THE DEFENDANT:  Yes, Your Honor.

                                                              22

```
1              THE COURT:  All right.  Now, there are multiple
2   special conditions.  The first special condition is that you
3   will serve the first six months of period of supervised
4   release under house arrest with such monitoring as the
5   probation office feels is necessary, and you will have to
6   pay the costs of whatever monitoring they decide to use; do
7   you understand that?
8              THE DEFENDANT:  Yes, Your Honor.
9              THE COURT:  Under that house arrest, you are
10  allowed out of your home only for the following reasons with
11  advance permission from the probation office.  Obviously to
12  attend to any medical needs for yourself or your child; to
13  attend to any employment opportunities that you may have; to
14  meet with any counselors, your probation officer or any
15  attorneys; to attend to any bona fide religious activities.
16  Other than those reasons, you cannot be out of your home for
17  any reason unless you have received permission in advance
18  from the probation office; do you understand that?
19             THE DEFENDANT:  Yes, Your Honor.
20             THE COURT:  Secondly, and obviously, you must
21  continue to fully engage with such mental health counseling
22  and treatment as the probation office approves.  So they'll
23  have to -- I'm sure they will be totally comfortable with
24  the program you've got, but you're going to have to keep
25  them fully monitored about what's going on.  You have to
```

```
1   waive any privacy rights that you have to the treatment
2   program so the probation office can be assured that you are
3   fully compliant; do you understand that?
4               THE DEFENDANT:  Yes, Your Honor.
5               THE COURT:  And obviously the costs of any mental
6   health treatment you must bear yourself; do you understand
7   that?
8               THE DEFENDANT:  Yes, Your Honor.
9               THE COURT:  All right.  I'm also imposing a
10  requirement that you serve 200 hours of community service.
11  That's something that you've already somewhat been doing,
12  but I want that under the control of the probation office;
13  do you understand that?
14              THE DEFENDANT:  Yes, Your Honor.
15              THE COURT:  All right.  You will have to provide
16  access to any and all of your financial information,
17  including any credit card accounts, any business data so the
18  probation office can monitor how you are using your
19  resources to make sure you're not engaging in some sort of
20  manic purchasing pattern; do you understand that?
21              THE DEFENDANT:  Yes, Your Honor.
22              THE COURT:  All right.  The Court finds that there
23  is no history of abuse of controlled substances, so the
24  mandatory drug testing is waived; however, at any point, the
25  probation office can demand a drug test from you, and you
```

24

 1    must comply; do you understand that?

 2              THE DEFENDANT:  Yes, Your Honor.

 3              THE COURT:  I find that you do have the financial

 4    resources to pay a fine in this case.  I'm imposing a fine

 5    of $20,000, which must be paid within the next 90 days; do

 6    you understand that?

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE COURT:  In addition, of course, there is the

 9    $100 mandatory special assessment that must be paid if it

10    has not already been paid; do you understand that?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  All right.  Are there any other

13    conditions of supervision, Mr. Carlberg, that the Government

14    would be requesting in this case?

15              MR. CARLBERG:  No, Your Honor.

16              THE COURT:  All right.  Mr. Grooms, is there

17    anything further you want the Court to address?

18              MR. GROOMS:  No, Your Honor.  Thank you.

19              THE COURT:  All right.  The last thing I want to

20    just advise you is that although under your plea agreement

21    you waived, which means you gave up your right to appeal

22    both your conviction and your sentence, you still have a

23    right to file an appeal.  If you're going to do so, the

24    notice of appeal must be filed within 14 days of today's

25    date.

                                                              25

1            Mr. Grooms, you are required to discuss those

2    options with your client.  And if you cannot afford an

3    attorney, since you do have a right to counsel for the

4    appeal process, one would be appointed for you; do you

5    understand that?

6            THE DEFENDANT:  Thank you.

7            THE COURT:  All right.  Then you're remanded at

8    this time in the custody of the United States Marshal who

9    will release you towards the end of the day.

10           THE DEFENDANT:  Thank you.

11           THE COURT:  All right.

12           (Proceedings adjourned at 10:22 a.m.)

13           -----------------------------------

14    I certify that the foregoing is a true and accurate

15    transcription of my stenographic notes.

16

17    _____

18           Stephanie M. Austin, RPR, CRR

19

20

21

22

23

24

25

                                                    26